[Cite as *State v. Rhodes*, 2022-Ohio-2337.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

LARENZ RHODES,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 20 MA 0099**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2019 CR 00116 B

**BEFORE:**
Cheryl L. Waite, Carol Ann Robb, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul J. Gains*, Mahoning County Prosecutor, *Atty. Ralph M. Rivera*, Assistant Chief Prosecuting Attorney, Criminal Division, and *Atty. Michael A. Rich*, Assistant Prosecutor, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503, for Plaintiff-Appellee

*Atty. Rhys B. Cartwright-Jones*, 42 North Phelps Street, Youngstown, Ohio 44503-1130, for Defendant-Appellant.

Dated:  June 30, 2022

**WAITE, J.**

{¶1}    Appellant, Larenz Rhodes, appeals the judgment and sentencing entries of the Mahoning County Court of Common Pleas following his jury trial.  The jury found him guilty of murder, conspiracy, improperly discharging a firearm at or into a habitation, and felonious assault.  These charges were all accompanied by firearm specifications. Appellant was also found guilty of improperly handling a firearm in a motor vehicle.  Based on the following, the judgment of the trial court is affirmed in its entirety.

<u>Factual and Procedural History</u>

{¶2}    On January 24, 2019 at approximately 1:30 a.m., Appellant was at the Speed Check Gas station in Youngstown, Ohio with Marquis Torres, Joquaun Blair, Burton McGee, and Martize Daniels.  A short time later, Gabriel Smith arrived, which ignited a discussion in the group about Blair and Daniels' animosity toward Smith.  They decided to follow Smith as he left the gas station.  Appellant was driving, and had a firearm in his possession.  As they approached the Victory Estates Apartment complex, Appellant fired his weapon at Smith out of the driver-side window of the vehicle.

{¶3}    After the shooting, the group went to the home of Daniels' mother.  While there, gunshots were heard outside and the house was struck by bullets.  Daniels testified that when he looked out of the window he observed a white vehicle that he knew belonged to Smith fleeing the scene.  The group decided to return to the Speed Check gas station. Smith was at the gas station when they arrived, and a shootout occurred between Appellant's group and Smith.  During the shootout, Daniels was shot in the leg and had to be treated at St. Elizabeth's hospital for his injuries.

<u>Case No. 20 MA 0099</u>

{¶4} After Daniels was released from the hospital, the group, with the exception of McGee, again assembled at Daniels' mother's home. According to trial testimony, Appellant had an AK-47 automatic rifle in his possession. He informed the group that they were going to retaliate for Daniels' injuries. The group, with the exception of the wounded Daniels, went to McGee's residence and convinced him to go with the group to the Victory Estates apartment where Smith lived with his girlfriend, Crystal Hernandez, and Hernandez's two-year-old son. The group proceeded to Smith's apartment in two vehicles; McGee drove one and Appellant drove the other. Once they arrived, they got out of their cars and walked to Smith's apartment. When they reached the outside of the apartment, they opened fire. Appellant was firing the AK-47. The group fled back to Daniels' home, where Appellant told Daniels that he fired into Smith's house and car with the AK-47.

{¶5} Officers from the Youngstown Police Department were called to the scene at Smith's apartment. On arrival, they found the victim, Crystal Hernandez, deceased in a bedroom. Her two-year-old son was alive and laying on top of her. Crime lab officers collected evidence from the scene, including eighteen spent 7.62 by 39 shell casings. According to officer testimony, this type of ammunition is used in high-powered weapons or rifles. An autopsy of the victim was performed and a bullet fragment was recovered. The fragment was examined by a technician at the Ohio Bureau of Criminal Investigation, who testified that it was consistent with a 30-nominal caliber, which includes a 7.62 by 39 bullet. The technician testified that this type of ammunition could not have been fired from a 9mm or .45 caliber weapon because those were different nominal caliber families. He

also testified that this caliber of ammunition would be used in an AK-47-style rifle manufactured by the companies Romarm and Norinco in Russia and China, respectively.

{¶6} According to trial testimony, the morning after the shooting Appellant was heard arguing with another individual about which member of the group shot first during the incident, with Appellant stating that he was the first to fire using the AK-47.

{¶7} On February 8, 2019, a multiple defendant indictment was issued which included Appellant. Appellant was indicted on: count one, aggravated murder in violation of R.C. 2903.01(A), an unclassified felony, with a firearm specification; count two, murder in violation of R.C. 2903.02(B), an unclassified felony, with an accompanying firearm specification; count three, conspiracy in violation of R.C. 2923.01(A)(2), a first-degree felony, with an accompanying firearm specification; count four, improperly discharging a firearm at or into a habitation or a school safety zone in violation of R.C. 2923.161(A)(1), a second-degree felony with an accompanying firearm specification; count five, felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony, with an accompanying firearm specification; count six, having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony; and count twelve, improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B), a fourth-degree felony.

{¶8} By agreement, the charge for having weapons while under disability was severed from counts 1, 2, 3 and 12, of the indictment.

{¶9} A jury found Appellant guilty of murder with the firearm specification; conspiracy with the firearm specification; improperly discharging a firearm into a habitation with a firearm specification; felonious assault with a firearm specification; and improperly handling firearms in a motor vehicle. As the trier of fact on the charge of

having weapons while under disability, the trial court concluded that the state presented credible and convincing proof of Appellant's guilt on that separate charge.

{¶10} On September 1, 2020, the trial court sentenced Appellant to a term of fifteen years to life in prison on count 2, murder, with a three year term for the firearm specification to be served consecutively to that count; eleven years on count 3, conspiracy, with three years for the firearm specification to be served consecutively to count 3; eight years on count 4, improperly discharging a firearm into a habitation, with three years for the firearm specification to be served consecutively to count 4; seven years on count 5, felonious assault, with three years for the firearm specification to be served consecutively to count 5; twenty-four months on count 5, having weapons while under disability; and twelve months on count 12, improperly handling firearms in a motor vehicle. The firearms specifications in counts 2, 3 and 4 merged for sentencing purposes for a total of three years, to be served consecutively and prior to the sentence on the corresponding counts. The firearm specification in count 5 was to be served consecutively and prior to the sentence in count 5. Thus, Appellant received a total of six years of imprisonment on all of the firearm specifications. The sentences for counts 2, 3, and 4 also merged for sentencing, for a total prison term of fifteen years to life in prison on those counts. The sentence in count 5 was to run consecutively to counts 2, 3, 4, 8, and 12. The sentence in counts 8 and 12 were ordered to run concurrent with each other, for a total of two years, but were ordered to run consecutively to counts 2, 3, 4, and 5. Ultimately, Appellant was sentenced to a total prison term of thirty years to life in prison. (9/1/20 J.E.)

{¶11} Appellant filed this timely appeal.

Case No. 20 MA 0099

ASSIGNMENT OF ERROR NO. 1

Appellant was denied his rights to due process, and a fair trial, as contemplated by both the Ohio and United States Constitutions when the jury reached, and the trial court allowed, a compromised verdict that was not supported by the evidence.

{¶12} Appellant claims in his first assignment of error that the verdicts are inconsistent and warrant reversal because he was found guilty of murder and conspiracy, but was acquitted of aggravated murder.

{¶13} Appellant contends that the jury's verdicts are the result of jury "acquiescence." *State v. Howard,* 42 Ohio St.3d 18, 537 N.E.2d 188 (1989). *Howard* pertains to the issue of a potential hung jury. Crim.R. 31(A) requires that all verdicts in criminal cases be unanimous, including both guilty and not guilty verdicts. A trial court has the discretion to determine whether a jury is "hung," or unable to reach a unanimous verdict. The United States Supreme Court held in *Allen v. U.S.,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), that trial courts may give the jury a supplementary instruction emphasizing the duty of the jury to make every effort to reach a unanimous decision. *Id.* However, in *Howard,* the Ohio Supreme Court rejected the so-called *Allen* charge as too coercive, and substituted a different instruction, as follows:

The principal mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere

acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others. You should consider it desirable that the case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.

*Howard,* pp. 25-26.

**{¶14}** In the instant matter, Appellant cites only to *Howard* and not to any evidence from the record in arguing that the jury was somehow hung or unable to reach a unanimous verdict, and that this resulted in his acquittal on the aggravated murder charge but conviction on the murder charge. We note that no *Howard* charge was given to the

jury in this matter and that there is nothing in the record to indicate they were unable to reach a unanimous verdict. He claims his acquittal on aggravated murder, itself, is somehow proof the jury reached a compromised verdict of guilty on the charges of murder, conspiracy, and discharging a firearm into a habitation.

{¶15} Appellant was charged in count 1 of the indictment with aggravated murder in violation of R.C. 2903.01(A), which provides, in pertinent part: "No person shall purposely, and with prior calculation and design, cause the death of another[.]" R.C. 2903(A)(1). Appellant was also charged with murder in violation of R.C. 2903.02(B), which provides: "No person shall cause the death of another as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" R.C. 2903.02(B). Appellant was also charged with improperly discharging a firearm into a habitation in violation of R.C. 2923.161(A)(1), which reads, "[n]o person, without privilege to do so, shall knowingly do any of the following: (1) discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual[.]" R.C. 2923.161(A)(1). Finally, Appellant was charged with conspiracy in violation of R.C. 2923.01(A)(2), which prohibits a person from agreeing with another person or persons, "that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses." Both murder and aggravated murder are listed as specified offenses in the conspiracy statute. R.C. 2923.01(A).

{¶16} Here, the jury deliberated for two days before determining Appellant was not guilty of aggravated murder but guilty of murder, conspiracy and improperly discharging a firearm into a habitation, among others. Appellant contends that this extended deliberation provides support for his contention that the jury as a whole reached

a compromised verdict or that this provides evidence there were holdout jurors who ultimately acquiesced with the others only in order to reach a unanimous verdict. Appellant does not support his speculative assertion with any actual evidence in the record. Moreover, contrary to Appellant's assertion, based on the evidence presented to the jury it was certainly reasonable for them to find Appellant guilty of murder, conspiracy, and that he fired into a habitation, without finding him guilty of the aggravated murder charge. To find Appellant guilty of aggravated murder, the state had to prove beyond a reasonable doubt that Appellant caused the death of Crystal Hernandez with "prior calculation and design." R.C. 2903.01(A). The evidence presented by the state in this matter, however, was that Appellant and his co-defendants conspired to follow Smith and later conspired to return to Smith's apartment, firing into the apartment with the intent to murder Smith. There was no evidence that Appellant, with prior calculation and design, intended to murder Hernandez. Any evidence of prior calculation and design on Appellant's part was directed at Smith, not Hernandez. However, the evidence that was presented, including carrying a loaded AK-47 in his car and opening fire on Smith's habitation, certainly supports the jury's decision to find Appellant guilty of murder regarding Hernandez's death. Thus, the jury could reasonably conclude that Appellant was guilty of murder, conspiracy, and intentionally discharging a firearm into Smith's apartment without finding him guilty of aggravated murder. Appellant's assertion that he was denied due process by the jury's verdict is not supported by the record, and we find no error.

{¶17} Appellant's first assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 2

Case No. 20 MA 0099

Appellant was denied his right to a fair trial and due process of law then the trial court permitted Catherine Daniels and/or Indonesia Torres to testify despite not being added to the state's witness list until the eve of trial. (Trial Transcript at 28-29, 420).

**{¶18}** Appellant contends the trial court erred in permitting the testimony of Catherine Daniels and Indonesia Torres when they were not added to the state's witness list until the eve of trial.

**{¶19}** It is well-settled that "[t]he trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Issa,* 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). Therefore, we limit our inquiry to a determination as to whether the trial court acted unreasonably, arbitrarily or unconscionably in permitting the testimony of these two witnesses. *State v. Adams,* 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶20}** Pursuant to Crim.R. 16(I), "[e]ach party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal."

**{¶21}** In the instant matter, Appellant contends the state intentionally left the names of these witnesses off of its witness list provided to him despite their inclusion on the witness lists of the various co-defendants in this matter. He asserts the state admitted that their testimony was material to the state's case. Defense counsel objected to the witnesses at trial, leading the trial court to inquire into why the state failed to include these two witnesses on Appellant's witness list:

Case No. 20 MA 0099

[**DEFENSE COUNSEL**]:  Secondly, Your Honor, last night I received a fax of an updated witness list.  There's three witnesses that the state added, Catherine Daniels, Indonesia Torres and Destiny Febres.  I'm going to object to the state bringing those witnesses in without notice simply because I read the transcript of two, of the three.  I believe it's littered with inadmissible hearsay and I don't think it would be proper at this point to allow them to testify.

THE COURT:  Okay.  Not knowing what they have to say, of course I don't know that I can make a ruling at this time on whether or not their testimony will be admitted.  You know, if you want to go outside of the presence of the jury we can go through the transcript and redact any testimony that was given.  Is it deposition or proffers?

[**PROSECUTOR**]:  Police interviews.

THE COURT:  Oh, interviews.  Okay.

[**PROSECUTOR**]:  Your Honor, if I may.  With regard to the late notice, the state has obviously filed several witness lists.  And the main one was filed back about a year ago in the [co-defendant] and [co-defendant] trial.

There's been several dozens of witnesses involved throughout the case.  The witness list [defense counsel] mentioned, the state would say are material for the case.  And they are mentioned, I believe, in the detective notes and throughout, points throughout the discovery.

**THE COURT**: This is all of the discovery, including these three witnesses given to the defense?

[**PROSECUTOR**]: To my knowledge. Yes.

[**PROSECUTOR #2**]: He would have had the recording of the interviews?

[**DEFENSE COUNSEL**]: I did.

[**PROSECUTOR #2**]: Okay. Correct.

**THE COURT**: And you had an opportunity to review those?

[**DEFENSE COUNSEL**]: I did. The only, the only -- I've had an opportunity to review Destiny Febres. And actually I just wasn't anticipating that they were going to testify because they weren't on the list.

And I believe during their interviews they talk a lot about different things that I don't believe to be admissible evidence. It's, there's certain testimony they can certainly testify but there's a lot of stuff that they can't and that's my concern.

**THE COURT**: Yeah, and that's something I guess, if you had discovery and you had an opportunity to know this is what their testimony is going to be -- you know, not knowing what they're going to say on the stand, I'm going to make a ruling on whether or not it's hearsay or not and if it's admissible.

[**DEFENSE COUNSEL**]: And I understand that, Your Honor. And if they were permitted to testify I'd object accordingly. I'm objecting to them being able to testify at all. I just want to go on the record.

**THE COURT**: Okay. Well, at this point I'm going to overrule you on that motion.

[**DEFENSE COUNSEL**]: Okay.

**THE COURT**: And again, I'll give you the opportunity to make the proper objections if they do in fact take the stand and testify.

[**DEFENSE COUNSEL**]: Okay. Fair enough.

(8/17/20 Tr., pp. 28-32.)

{¶22} Pursuant to Crim.R. 16(L)(1), a trial court has the discretion to fashion a remedy when a party fails to comply with discovery:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

Crim.R. 16(L)(1).

**{¶23}** Defense counsel did not request a continuance in order to prepare for these witnesses. His sole request was for the trial court to exclude these witnesses. While the trial court refused to exclude the witnesses entirely, the court did make certain Appellant's counsel had some additional time to prepare, if necessary. After the jury was impaneled and the parties presented opening statements, defense counsel renewed his objection regarding these witnesses and the following exchange occurred outside of the presence of the jury:

[**DEFENSE COUNSEL**]: Also, one more thing so we don't have to do it tomorrow. I'm going to again renew my objections to the testimony of Destiny Febres, Catherine Daniels and Indonesia Torres.

**THE COURT**: Okay. My main concern with regard to that objection initially was, did you -- or were you aware of those statements, was that provided to you in discovery. And my understanding was that that information was provided to you in discovery. And I don't see how I can rule on this issue at this point because I don't know what they have to say. I mean, and I know your concern was hearsay.

[**DEFENSE COUNSEL**]: Well, so yes, Your Honor, that's one path I was concerned with. But I'm concerned also that I received the witness list with those witnesses on the morning of trial. So that would be the basis of the renewal. I did not have leads on any of them. And while there was a transcript of Catherine Daniels and Destiny Febres there was no transcript of Indonesia Torres.

**THE COURT**: Okay. Do you want an opportunity to be able to speak with that witness?

[**DEFENSE COUNSEL**]: Well, I just want to be able to be adequately prepared to cross examine them.

**THE COURT**: Okay.

[**DEFENSE COUNSEL**]: Now, it's my understanding today that the state may not be putting these three witnesses on. But it was my -- going to trial this morning I was under the impression that those three witnesses weren't testifying today.

**THE COURT**: State, what do you have to say?

[**PROSECUTOR**]: Your Honor, as the state mentioned yesterday in response to his objection, the state did provide copies of interviews. Copies, when I say copies I mean on disk, audio video interviews where each of these witness [sic] gave very material and pertinent information to add to the case. I think that obviously when [defense counsel] reviews those tapes, to say these people are very likely, almost impossible to say not to put those individuals on.

He's had that, those pieces of evidence, which really is important evidence, since the outset of this trial. So he's had adequate notice that these witnesses would be testifying. With regard to his, he wanted to see

a copy of the transcript of Indonesia Torres' statement, that part is true. However, he did have a full statement on disk prior to this.

I would also add additionally I don't think today we'd get to any of -- and just the way the trial is progressing, I can't imagine we'd get to any of these individuals today. So I think [defense counsel] would have adequate time to look over the transcript of Ms. Torres.

THE COURT: Okay. I want to be fair to both parties. If they were provided in discovery then I think there was notice that you actually had them, [defense counsel]. If you need additional time to prepare or cross examine any of them, you know, I would, I would ask the prosecutor not to put them on. And give you enough time prior to putting them on the stand to, you know, review their testimony and get ready for it.

So if you're saying that you're not going to put them on the stand today, --

[PROSECUTOR]: I don't believe we'll get to them today.

THE COURT: Well, I'm going to ask you not to get to them today so that if [defense counsel] needs time to, you know, review their statements, you know, this evening to be able to do that. Is that adequate?

[DEFENSE COUNSEL]: (Nods head.)

**THE COURT**: In essence I'm overruling your motion with the provision that the state not put them on the stand today until you've had adequate opportunity to review, you know, their statements prior to their testimony.

(8/17/20 Tr., pp. 420-424.)

{¶24} Hence, while the record shows the state did not comply with Crim.R. 16 because it failed to timely include the witnesses in question on the witness list, it was apparent Appellant's counsel had obtained all available discovery regarding the witnesses and the trial court fashioned a remedy for the state's late notice by ensuring that defense counsel had adequate time to review this discovery and prepare for cross-examination. By ordering the state hold the witnesses until the following day, the trial court effectively granted a continuance in order to provide defense counsel with additional time to prepare. *State v. Shuba,* 7th Dist. Mahoning Nos. 09 MA 185, 09 MA 186, 2011-Ohio-5135, ¶ 28, citing *Lakewood v. Papadelis,* 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987). Counsel admitted that he had reviewed the witnesses' likely testimony and the main thrust of his objection and request for their exclusion was that counsel believed much of what they might say was hearsay. This presumption was speculative and premature, however, as the trial court indicated. Again, the record reflects that Appellant's counsel was in possession of all relevant discovery as to the witnesses, but had not expected they would offer testimony. The trial court essentially granted counsel time for preparation. The record reflects that the trial court did not abuse its discretion in allowing the witnesses to testify.

{¶25} Appellant's second assignment is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 3

Case No. 20 MA 0099

Each of the convictions was against the manifest weight of the evidence as none of the state's witnesses could be believed as they were each admitted liars, and each received considerable consideration from the state fore [sic] their testimony.

**{¶26}** Appellant contends the verdict is against the manifest weight of the evidence, stating "the state's entire case was based on the testimony of three snitches." (Appellant's Brf., p. 10.)

**{¶27}** Weight of the evidence focuses on "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *Thompkins,* 78 Ohio St.3d 380, 387 678 N.E.2d 541 (1997). A review of the manifest weight of the evidence focuses on the state's burden of persuasion and the believability of the evidence presented. *State v. Merritt*, 7th Dist. Jefferson No. 09 JE 26, 2011-Ohio-1468, ¶ 34. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 484 N.E.2d 717 (1st Dist.1983).

**{¶28}** A reversal under a manifest weight review in a criminal matter should be granted only "in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Andric*, 7th Dist. Columbiana No. 06 CO 28, 2007-Ohio-6701, ¶ 19, citing *Martin* at 175. Determinations regarding witness credibility, conflicts in testimony, and the weight to give the evidence "are primarily for the trier of the facts." *State v. Hunter*,

131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 995, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh all evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). When presented with two fairly reasonable perspectives regarding the evidence or with two conflicting versions of events, neither of which can be ruled out as unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

{¶29} The state presented testimony from multiple witnesses during its case-in-chief and it is not entirely clear to which three witnesses Appellant is referring. Appellant argues that other than the three witnesses he calls "snitches," the only other evidence offered by the state was surveillance footage that was "too grainy for anyone, other than the snitches, to identify." (Appellant's Brf., p. 10.) A review of the record reveals this is an inaccurate characterization of the evidence offered by the state, at best.

{¶30} The state presented the testimony of Nivea Ramos, Crystal Hernandez's mother, who testified that Crystal was residing in the apartment with Smith and their two year old son on the night she was shot. Next, the state presented the testimony of Patrick Dyce, who testified that he was the owner of a Kia Soul that had been parked in his driveway in Campbell, Ohio about one month prior to the incident. He testified that his fiancée saw it in the driveway around midnight when she took the dog out. When Dyce again took the dog out around 3:00 a.m., the car was gone. He filed a police report with the Campbell Police Department and was notified about a month later by the Youngstown

Police Department that the car had been recovered, riddled with bullets. He testified that he had never given Appellant or anyone other than his fiancée permission to drive the car. Next, the state presented the testimony of Officer Luis Villaplana of the Youngstown Police Department. The officer testified that Dyce's vehicle had been used in a homicide and had been left at the intersection of Rosewood and Willow Avenues in Youngstown. Officer Villaplana testified that he responded to this area and, after no one arrived to recover the vehicle, he had it towed. He identified the vehicle at the Youngstown address from a photograph of Dyce's vehicle submitted into evidence by the state.

{¶31} Martize Daniels next testified that on the night of the incident he was residing with his mother in an apartment in Rockford Village. He testified that he was interviewed by Detective Rick Spotleson of the Youngstown Police Department. While he told Detective Spotleson that on the night of the incident he got shot in the leg somewhere on the south side of Youngstown, he admitted on the stand that he had lied to the detective. Eventually, he had changed his story and told Detective Spotleson that he had been shot while at the gas station where the shootout with Smith and Appellant had occurred. The state presented a surveillance tape of the incident at the gas station. Daniels identified the car driven by Smith and identified Appellant as the driver of the stolen Kia. Daniels testified that he, Appellant, and other co-defendants decided to follow Smith out of the gas station parking lot. Appellant had a gun in the car at that time. He testified they drove to the Victory Estates apartments after leaving the gas station and that Appellant fired his gun out of the driver's side window at Smith. (8/17/20 Tr., p. 465.) He testified that Appellant was the only shooter at that time. Afterward, they returned to his mother's apartment around 2:00 a.m. and a short time later gunfire was heard and the

residence was shot multiple times. He saw a car that he knew was Smith's driving away from the scene. He testified the group then returned to the gas station at around 5:00 a.m. The surveillance footage was played, showing the shootout that occurred at the gas station where Daniels was shot in the leg. Daniels identified Appellant in the driver's seat of the Kia holding a gun and firing during the shootout. He testified that after he was shot, the group drove back to his mother's apartment and he called his girlfriend to take him to the hospital for treatment of his gunshot wound. (8/17/20 Tr., p. 482.) He testified that after he returned to the apartment on release from the hospital, hours later, the group had reassembled. There were multiple guns present, mostly handguns, with the exception of an AK-47 that Appellant was holding. The group discussed retaliation against Smith for Daniels' injury. He testified that shortly thereafter, the group got in the Kia and drove away. He remained at the apartment because of his gunshot injury. He testified that the group received a call that Crystal Hernandez had been killed during the retaliation and that they watched the coverage of the incident on the local news.

{¶32} Daniels acknowledged that he had changed his story about his shooting from the story he originally told Detective Spotleson. He acknowledged that he had signed a plea agreement with the state, which involved the dismissal of some of the charges on which he was indicted in exchange for providing his testimony. On cross-examination, Daniels again admitted that he had changed his story about the incident from the one he originally told Detective Spotleson during his initial interview at the hospital. He also acknowledged that he had been given multiple medications, including Tramadol for pain, while at the hospital and had been under its influence when he returned to his mother's home and witnessed Appellant holding the AK-47. He also acknowledged

that after arriving home from the hospital he spent a great deal of time upstairs in bed, away from the others in the group. He testified that he had a criminal history of improperly handling a firearm and again acknowledged that he had been charged with aggravated murder for his part in this incident but had pleaded guilty to a charge of felonious assault in exchange for his testimony.

**{¶33}** Officer Martin Stachowicz testified that he was one of the responding officers at the scene of the shooting on the morning of the incident. He testified that he arrived on the scene and found the victim, later identified as Crystal Hernandez, lying deceased on the floor with her young son sleeping on top of her. He testified that he secured the scene and awaited the arrival of investigating personnel.

**{¶34}** Officer Greg Miller also testified for the state. He was assigned to the crime lab and was responsible for collecting evidence from the scene on the morning of the incident. He took photos of shell casings found outside in the parking lot as well as those found inside of the apartment. He took various other photos of the scene and testified as to photographs submitted into evidence by the state, including as to where spent casings were located and what type of casings they were. He testified as to the location of the Tulammo 7.62 by 39 casings, stating that there were a total of eighteen at the scene, including around the victim. He testified that this type of casing could come only from a high-powered rifle and not from a handgun. (8/17/20 Tr., p. 594.) He testified that the casings were collected and bagged separately to preserve any DNA evidence. DNA samples were taken from Appellant, Daniels, and McGee. He testified about receiving several pieces of bullet fragments that were recovered from the victim's body, which he packaged and sent to the Bureau of Criminal Investigation ("BCI") for analysis.

{¶35} The next witness to testify was Kelsey Simon, an investigator with the Mahoning County Coroner's office. She testified regarding the bullet hole injuries in the head of the deceased and regarding the casing fragments that were recovered from the body. She took photographs of the wound and the fragments and forwarded them to BCI for ballistics analysis.

{¶36} Indonesia Torres then testified. She was at McGee's home when Appellant and the rest of the group arrived to convince McGee to join them in looking for Smith. She said while the group was there they were carrying various guns including an AK-47 and that when the group left McGee's home, Appellant was carrying the AK-47. (8/17/20 Tr., p. 694.) She watched the group drive away. Appellant was driving a gray Kia. McGee was driving his white Kia. She said the group returned sometime later. The following morning, she heard Appellant arguing with the others about who shot first during the incident. On cross-examination, Torres was asked about certain discrepancies in her initial statement to Detective Spotleson. Specifically, defense counsel asked why she never mentioned seeing the group with guns or that they left McGee's home in two cars, with Appellant driving the gray Kia, during her initial interview with Detective Spotleson. She said that she thought she had.

{¶37} Catherine Daniels, Martize Daniels' mother, was next to testify. She testified that her house was shot at during the incident. She testified about her son getting shot in the leg and that she heard the group arguing in her home about going after Smith after her son got shot.

{¶38} Burton McGee testified next. He testified that when the group initially went to the gas station on the day of the incident, Appellant was driving the group in the gray

Kia. When the group spotted Smith and began following him, Daniels shot at Smith's car from the front passenger seat of the Kia until his gun jammed. He did not recall that anyone else in the car had a gun at that time. He testified that after the group returned to Daniels' home, gun shots were fired at the house. He noticed that Appellant had an AK-47 in his possession at that time. He went home after that, but later the group came to his residence in the gray Kia to urge him to go back to the gas station to look for Smith. McGee got in his car, with a few members of the group joining him. After a brief stop at the gas station, the group traveled in the two cars to the Victory Estates apartments. They drove past, turned around, and went past again before leaving their cars and walking to Smith's apartment. He testified that Appellant was carrying the AK-47 and others had handguns. When the group got to Smith's residence, they stood in the parking lot and began firing at the residence and at Smith's car, which was parked in the lot, before running back to the two cars. A surveillance video was played for the jury. McGee identified Appellant on the video as the individual carrying the AK-47 while the group ran back to the cars. The group returned to Daniels' home before going to their own homes.

{¶39} On cross-examination McGee testified that he had a "beef" with Smith because he thought Smith was not loyal to the group. Defense counsel asked about the discrepancy in his testimony from his interview with Detective Spotleson, specifically about whether Appellant had fired a gun during the initial shootout at the gas station. He testified that Appellant had not argued with Smith, but Appellant did not like him. McGee testified he had a firearm in his possession during the incident but did not fire it when they were outside of Smith's apartment.

**{¶40}** The next witness to testify was James Winston, Director of Security Operations for the Youngstown Metropolitan Housing Authority (YMHA). He testified that Victory Estates, where the incident occurred, was a YMHA property. He authenticated the surveillance footage of the incident at Victory Estates. He pointed out the gray Kia driven by Appellant as well as McGee's white Kia on the footage.

**{¶41}** William Santiago testified next. At the end of January of 2019, he was an inmate at the Mahoning County Jail. He knew Crystal Hernandez because Smith was his cousin. He testified that while at the jail he had a conversation with Appellant, who was also an inmate at that time. He testified that someone else asked Appellant why he was there and Appellant said it was "for a burglary or robbery or something like that." (8/17/20 Tr., p. 857.) Santiago testified that someone else came up and "put [Appellant] on blasts about him being in there for the murder of Crystal. And you know [Appellant] denied it but he ended up coming out and saying that it was him." (8/17/20 Tr., pp. 857-858). Santiago described Appellant telling him about firing the AK-47:

> He still had the excitement in his face of shooting the gun. * * * Oh, he was describing how he was shooting the gun. He made a motion with his hands as if it was still on the side and as if he was walking up. * * * He was just like, he was just like he was still shooting. He was excited like he was still shooting. * * * No, he was not shooting a pistol, or demonstrating shooting a pistol.

(8/17/20 Tr., pp. 859-860.) Santiago told Appellant that Smith was his cousin and related Appellant's response: "* * * he told me that my cousin was a dead man." (8/17/20 Tr., p.

861.) Santiago spent approximately two days in the same jail pod with Appellant before he was sent to prison. After identifying Appellant in the courtroom, Santiago testified that he did not receive any kind of relief from his prison sentence in exchange for his testimony.

{¶42} The next witness to testify for the state was Julie Altizer, a forensic scientist with BCI, DNA and biology section. She testified as an expert witness about the forensic report she generated regarding the incident. She was responsible for doing a comparative analysis of the DNA samples obtained from Appellant and his co-defendants with the DNA samples obtained from the scene, including the vehicles used during the shooting. She testified that Appellant's DNA was included as a possible match for DNA evidence recovered from the steering wheel of the gray Kia.

{¶43} Kevin Belcik, forensic scientist with the BCI, Firearms Toolmarks Unit, also testified as an expert witness. Belcik testified that he was tasked with looking at the shell casing evidence from the incident to determine how many guns had been used and which guns had been fired. He was not given any firearms to test fire, but had to conduct a "general microscopic comparison" to determine which fired cartridge cases matched up with each fired bullet component. Belcik testified that there were a number of shell casings found at the scene that were consistent with casings from a pistol. (8/17/20 Tr., p. 942.) He also testified that testing of the bullet fragment recovered from the victim's body revealed it was consistent with a 30-nominal caliber, which includes a 7.62 by 39 or casing from an AK-47 type of gun, and was not consistent with a casing from a handgun. (8/17/20 Tr., p. 948.)

**{¶44}** Joquaun Blair testified next. He was in the car with Appellant and Daniels when they decided to follow Smith from the gas station. He testified that after they followed Smith's car, Daniels fired at Smith first, and then Appellant shot at Smith. (8/17/20 Tr., pp. 970-971). After Daniels' residence was shot at, Blair was in Appellant's car when the group returned to the gas station where the shootout which resulted in Daniels' injury occurred a short time later. Blair testified that the group returned to Daniels' house while Daniels was being treated at the hospital for his gunshot wound. The group decided to go to Smith's residence to "[s]hoot up his car and stuff." (8/17/20 Tr., p. 992). He testified that another co-defendant brought two handguns and an AK-47. Blair said he took the .45 caliber handgun, one co-defendant took a Glock handgun, another took a 9 mm handgun, and Appellant took the AK-47. (8/17/20 Tr., pp. 993-994). Blair was in the front passenger seat, Appellant was driving, and one other co-defendant was in the backseat. He testified that the group shot at Smith's residence and car before fleeing back into their cars. He saw Appellant coming back to the car carrying the AK-47. (8/17/20 Tr., p. 1001.)

**{¶45}** The last witness to testify for the state was Detective Rick Spotleson. He testified that Hernandez was killed by a single gunshot wound to the back of the head. He had interviewed a large number of suspects involved in the incident as well as several witnesses. During his testimony, the surveillance footage from the gas station and from the Victory Estates apartments were again played and Detective Spotleson identified Appellant and other co-defendants in the footage. He testified that he had interviewed Appellant, who admitted his involvement in the shootout at the gas station but denied being involved in the shooting at Smith's apartment.

**{¶46}** At the end of the state's case, the defense rested without calling any witnesses.

**{¶47}** After reviewing the record, we conclude that Appellant's convictions were not against the manifest weight of the evidence. Although Appellant contends the state's entire case relied on a "grainy" surveillance video and witnesses who were "snitches," this is simply not borne out by the record before us. The state presented multiple witnesses who testified that Appellant possessed a firearm, specifically an AK-47, prior to the incident and that he had that firearm with him throughout all of the events that transpired that evening and into the early morning hours. This involved multiple steps and encounters that escalated tensions and resulted in the death of Crystal Hernandez. The state also presented testimony of the BCI experts who performed tests of the DNA and bullet casings recovered from the scene. The testimony placed Appellant in the driver's seat of the grey Kia seen on the surveillance footage at both the gas station and the Victory Estates apartments. The ballistics expert's testimony identified a bullet fragment found in the victim's body and testified that it could not have come from a handgun. Multiple witnesses testified that only Appellant had the AK-47 in his possession and that Appellant was seen carrying this weapon before and after the incident and firing the AK-47 during the incident. Finally, there was testimony from several witnesses that Appellant boasted that he fired the AK-47 during the incident that killed Hernandez.

**{¶48}** Appellant's third assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 4

The trial court committed plain error when it did not merge various sentences.

{¶49} In his fourth assignment of error Appellant contends his convictions for felonious assault, improper handling of a firearm in a motor vehicle, having weapons under a disability, murder, and improperly discharging a firearm into a habitation are allied offenses of similar import and should have merged for sentencing.

{¶50} R.C. 2941.25 codifies the constitutional double jeopardy protection against multiple punishments for the same offense. See *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10, 12. R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶51} Appellant acknowledges that the issue of allied offenses was not raised to the trial court. Crim.R. 52(B) affords an appellate court discretion to correct plain errors that affect a substantial right despite the accused's failure to bring the errors to the attention of the trial court. However, the accused bears the burden of proof to demonstrate plain error on the record. *State v. Quarterman,* 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15. Thus, Appellant must show an error, or deviation from

a legal rule that constitutes an "obvious defect" in the trial proceedings. *State v. Barnes,* 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Even if the error is obvious, however, it must have affected a defendant's substantial rights. *Id.* Substantial rights are defined to mean that the trial court's error must have affected the outcome of the trial. *Barnes,* at p. 27. The accused must demonstrate a reasonable probability that the error resulted in prejudice. *State v. Rogers,* 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. In order for Appellant to prevail in his argument that plain error occurred and that the offenses at issue were of similar import and subject to merger, Appellant must demonstrate a reasonable probability that the offenses were committed with the same conduct and the same animus, resulting in a prejudicial effect on the outcome of the trial.

{¶52} In *Ruff*, the Ohio Supreme Court announced a fact-specific analysis that considers the defendant's conduct, the animus, and its import in making a determination as to whether offenses are allied offenses of similar import and subject to merger. *Ruff,* ¶ 25. The test set forth in *Ruff* asks three questions: (1) whether the offenses are dissimilar in import and significance, i.e., each offense caused a separate and identifiable harm; (2) whether the offenses were separately committed; and (3) whether the offenses were committed with separate animus or motivation. *Id.* If the resulting answers to any of these three questions is yes, then the offenses do not merge. The *Ruff* court acknowledged that results will vary on a case-by-case basis because of the very fact-specific nature of the test. *Id.* at ¶ 32.

{¶53} Appellant first claims that the offenses of felonious assault, improper handling, and having a weapon while under disability should all have merged for

sentencing purposes because all three charges were the result of Appellant pursuing and shooting at Smith at 1:30 a.m. on January 24, 2019.

{¶54} Appellant was charged with having weapons while under disability pursuant to R.C. 2923.13(A)(2), which provides:

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

* * *

(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.

{¶55} Appellant was also charged with felonious assault pursuant to R.C. 2903.11(A)(2):

(A) No person shall knowingly do either of the following:

* * *

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

**{¶56}** Additionally, Appellant was charged with improperly handling firearms in a motor vehicle, pursuant to R.C. 2923.16(B), mandating that:

(B) No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle.

**{¶57}** Appellant argues that all three charges relate only to his pursuit of and shooting at Smith. In order to show the animus for having a weapon while under disability the state is required to show a defendant made a conscious choice to possess a weapon; which necessitates the offender making the choice to first possess the weapon, prior to committing other crimes. *State v. Cowan,* 8th Dist. Cuyahoga No. 97877, 2012-Ohio-5723, ¶ 39. It is unlikely that this offense could possibly merge with other offenses for sentencing when it is a condition precedent to using the weapon to commit the other crimes for which Appellant was charged. "The fact that [the defendant] then used the weapons to commit the other crimes does not absolve [the defendant] of the criminal liability that arises solely from his decision to illegally possess the weapons." *State v. Scott,* 8th Dist. Cuyahoga Nos. 106451, 106474, 2018-Ohio-3791, ¶ 36, quoting *Cowan* at ¶ 39.

**{¶58}** The evidence in the record reveals that Appellant was seen in possession of the AK-47 at Daniels' home after the shootout occurred at the gas station. The state also presented evidence that Appellant admitted he fired the weapon into Smith's apartment during the incident which led to Hernandez's death. This evidence shows Appellant was in possession of the firearm prior to both the pursuit of and shooting at

Smith and the gunfire directed into the habitation causing Hernandez's death. The offense of having a weapon while under disability requires only a conscious choice to acquire and possess a weapon which, under the facts of this case, occurred prior to the incident. Appellant offered no evidence that he obtained the AK-47 at the same moment he committed his other crimes and for the sole purpose of pursuing and shooting Smith.

{¶59} As noted above, Appellant was already in possession of a weapon prior to the conduct which led to the felonious assault and improper handling convictions. The conviction for felonious assault is based on Appellant's act of shooting at Smith out of the driver's side window during the encounter at the gas station. Appellant's conviction for improper handling of firearms in a motor vehicle stems from incidents which occurred both before and after the felonious assault on Smith at the gas station, and arise from incidents which occurred before and after the shooting of Hernandez in her home. This record reflects the offenses of felonious assault, improperly handling firearms in a motor vehicle, and having a weapon while under disability were committed separately and, thus, cannot be merged for sentencing.

{¶60} Appellant also urges this Court to recognize plain error for the trial court's failure to merge murder and improperly discharging a firearm at or into a habitation.

{¶61} "[A] defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Ruff* at ¶ 26.

{¶62} The evidence at trial showed that Smith was inside the apartment he shared with Hernandez and their two-year-old son when Appellant and his co-defendants opened fire on their residence. When Appellant and his group returned to Daniels' home after the

incident, Appellant boasted that he had fired the AK-47 into the home. Days later, while in jail, he also told Santiago that he shot the AK-47 into the apartment, resulting in Hernandez's death.

**{¶63}** This record reflects that the offenses of murder and discharging a firearm into a habitation clearly caused a "separate, identifiable harm." *Ruff*, ¶ 25. While the shooting was directed at Smith, the shots fired by Appellant endangered every person inside the home, including Hernandez and her two-year-old child, thereby creating additional harm to additional victims which was distinct from the intended harm to Smith. No plain error was committed by failing to merge these offenses.

**{¶64}** Appellant's fourth assignment of error is without merit is overruled.

**{¶65}** Based on the foregoing, Appellant's assignments of error are without merit and the judgment of the trial court is affirmed.

Robb, J., concurs.

D'Apolito, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.


**JUDGE CHERYL L. WAITE**

**JUDGE CAROL ANN ROBB**

**JUDGE DAVID A. D'APOLITO**


**<u>NOTICE TO COUNSEL</u>**

**This document constitutes a final judgment entry.**