[Cite as *State v. Gilmer*, 2024-Ohio-1178.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

        Appellee

v.

Donte Gilmer

        Appellant

Court of Appeals Nos.  L-22-1307
L-22-1308

Trial Court Nos.  CR0202201132
CR0202102065

**DECISION AND JUDGMENT**

Decided:  March 28, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** In this consolidated appeal, following a jury trial, defendant-appellant, Donte Gilmer, appeals the December 1, 2022 judgments of the Lucas County Court of Common Pleas, convicting him of aggravated murder, aggravated robbery, murder, felonious assault, discharge of a firearm on or near prohibited premises, and having weapons while under disability, along with firearms and repeated violent offender specifications. For the following reasons, we affirm, in part, and reverse, in part.

## I. Background

{¶ 2} Donte Gilmer was indicted in two separate cases. Lucas County case No. CR0202102065 arose out of an incident on June 28, 2021, in which Gilmer allegedly shot at the vehicle of K.B while both she and her five-year-old daughter were in the car. Gilmer was charged with two counts of felonious assault, violations of R.C. 2903.11(A)(2) and (D), with specifications under R.C. 2941.145(A), (B), (C), and (F) and R.C. 2941.149 (Counts 1 and 2); discharge of a firearm at or near a prohibited premises, a violation of R.C. 2923.162(A)(3) and (C)(2), with specifications under R.C. 2941.145(A), (B), (C), and (F) and R.C. 2941.149 (Count 3); and having weapons while under disability, a violation of R.C. 2923.13(A)(2) and (B) (Count 4).

{¶ 3} Lucas County case No. CR0202201132 arose from the November 7, 2021 murders of L.L. and N.C. Gilmer was charged with two counts of aggravated murder, violations of R.C. 2903.01(B) and (G) (Counts 1 and 2); aggravated robbery, a violation of R.C. 2911.01(A)(3) and (C) (Count 3); two counts of murder, violations of R.C. 2903.02(B) and 2929.02 (Counts 4 and 5); and two counts of felonious assault, violations of R.C. 2903.11(A)(2) and (D) (Counts 6 and 7). All counts contained specifications under R.C. 2941.145(A), (B), (C), and (F) and R.C. 2941.149(A).

{¶ 4} Despite a motion to sever the indictments, the two cases were tried together to a jury. The state presented the testimony of Toledo Police Officers Kerry Hayes and Tyson Phalen; Toledo Police Detectives Jason Mussery, Javier Ramirez, Danielle Mooney, and Jeffrey Sharp; Toledo Police Forensic Laboratory Administrator, David

2.

Cogan; FBI Special Agent Jacob Kunkle; Lucas County Coroner, Diane Scala-Barnett, M.D.; Bureau of Criminal Investigations forensic scientist, Stacy Violi; K.B., the victim of the June 28, 2021 incident; and additional fact witnesses, D.T. (who called 9-1-1 on November 7, 2021), Le.L. (the sister of L.L.), L.J. (Gilmer's friend), C.V. (N.C.'s mother), and T.W. (a friend of L.L. and N.C.).

## A.  The June 28, 2021 Shooting

{¶ 5} According to the evidence presented at trial, the victim, K.B., and Gilmer once lived together and had been romantically involved.  Their relationship ended in February or March of 2021.  After the break-up, K.B. learned that she was pregnant with Gilmer's child.  Gilmer, who goes by the nickname "Juv" or "Juvie," did not take the break-up well.  He threatened K.B. and told her that if he could not have her, no one could.  Despite such threats, K.B. was not afraid of Gilmer.

{¶ 6} In the spring of 2021, Gilmer's younger brother died in a four-wheeler accident.  This event was traumatic for Gilmer.  A memorial for his brother was erected in a field next to an abandoned house in the 700 block of Vance Street, where Gilmer had grown up.  After Gilmer's brother died, his family had rings and necklaces made that carried his ashes.  Gilmer wore a ring with his brother's ashes.

{¶ 7} K.B. and Gilmer had gotten a dog together.  They often communicated about the dog.  The dog and its supplies were on Langdon Street in the South End, where Gilmer was staying.  On June 27, 2021, K.B. went to the house on Langdon to get the dog and the supplies.  She banged on the door with a piece of wood.  K.B. and Gilmer got

3.

in a scuffle on the porch; Gilmer grabbed her. Gilmer went in the house and initially refused to give her the dog or its things. Eventually he threw the dog out the door and called the police. Police arrived on the scene and told K.B. to leave. K.B. returned and was throwing things at the house, prompting another visit from the police.

{¶ 8} On June 28, 2021, K.B. again went to the Langdon house to get the dog's supplies. Gilmer was not there, so she drove to Vance Street to find him. K.B.'s five-year-old daughter (who is not Gilmer's child) was in the car with K.B., as was the dog. Gilmer walked towards the car aggressively, so K.B. rolled up her window and started to back up. Gilmer began yelling, then walked away into the abandoned house next to the field where his brother's memorial was located. K.B. called 9-1-1.

{¶ 9} Gilmer came out shouting at K.B. and she told him that she was on the phone with the police. Gilmer started shooting. K.B. tried to pull away, but her car stalled. She told the 9-1-1 operator what was happening. The gunshots—eight of them—were audible on the 9-1-1 audio recording. Gilmer fled. K.B. succeeded in getting her car started and pulled away. She drove to 708 Avondale Street, where her sister lives, dropped off her daughter and the dog, then returned to Vance Street. The Avondale address is two city blocks from where the incident occurred—three-tenths of a mile—and is a two-minute drive if one travels the speed limit.

{¶ 10} When K.B. returned to Vance Street, Toledo Police Officer Kerry Hayes was there. Initially, Officer Hayes had been dispatched to the 700 block of Vance because a ShotSpotter—a gunshot detection and location system with GPS-enabled

4.

microphone sensors—detected gunshots. The 9-1-1 call, which was made at 11:40, directed her to 736 Vance. Officer Hayes arrived at 11:50. When Officer Hayes first arrived, she saw no one, but K.B. soon pulled up in her burgundy SUV. K.B. told Officer Hayes that Gilmer ran into the abandoned house. Officer Hayes told K.B. to pull further down the road to the 800 block of Vance.

{¶ 11} Other officers arrived and searched the abandoned house, but Gilmer was not there. Officer Hayes spoke with K.B. and observed her vehicle. She saw bullet holes in the driver's door and in the tailgate. K.B. told Officer Hayes that Gilmer had shot at her from the grassy field adjacent to 736 Vance. K.B. described the gun as a nine-millimeter semiautomatic pistol. Officers who searched the area were able to find three of the eight nine-millimeter casings. According to testimony from Officer Tyson Phalen, it can be difficult to find casings, especially if they are in the grass.

{¶ 12} Detective Jason Mussery was assigned to investigate the incident. He observed three bullet defects in K.B.'s driver side door and one or two in the rear of the vehicle. He submitted the casings to be input into the NIBIM system for analysis. Detective Mussery testified that ShotSpotter detected only six gunshots, but eight shots could be heard in the 9-1-1 call. K.B. told Detective Mussery that Gilmer was wearing a black hat, black shirt, black shorts, and white tennis shoes. Gilmer was found later that day wearing clothes that matched K.B.'s description.

{¶ 13} Detective Mussery conceded on cross-examination that he did nothing to verify that K.B.'s daughter and dog had been dropped off on Avondale. He was also

5.

questioned concerning the feasibility of K.B. leaving Vance at 11:48 (the time the dispatcher noted that K.B. was able to get her car started), driving from Vance to Avondale, dropping off a five-year-old and a dog, and returning to Vance by 11:50. Detective Mussery confirmed that 11:48 was the time that the dispatcher made the note and not necessarily the precise moment that K.B. was able to start her car. He also testified that he timed the drive between the 700 block of Vance and 708 Avondale while traveling the speed limit and it took two minutes.

{¶ 14} K.B. did not tell Detective Mussery about her confrontation with Gilmer the night before; rather, she told Detective Mussery that everything seemed fine between her and Gilmer. Also, K.B. conceded that she told Gilmer in a phone call, "I have all the power over you." She explained that when she said this, she meant that if she continued showing up for court, he would go to jail. She maintained that she did not want to testify against him at trial.

**B. The November 7, 2021 Murders**

{¶ 15} On November 7, 2021, the ShotSpotter alerted to shots fired on Vance at 6:54:57. D.T. lives in the 800 block of Vance. At approximately 6:55 a.m., she called 9-1-1 to report that she heard shots fired on her street. She looked out her bedroom window and saw a man shooting into a car while running backwards. He ran through the field towards Amelia Street. He was wearing a black hooded sweatshirt.

{¶ 16} Officers and detectives arrived at 848 Vance to find N.C., deceased, lying in the road about ten feet away from a parked vehicle. L.L. was seated in the driver's

6.

seat of the vehicle and also was deceased. According to the Lucas County Coroner, both women had been shot twice in the head—once in the back of the head and once in the side of the head. Stippling on L.L.'s ear revealed that the shot to the side of her head was fired from within one to one-and-a-half feet away. L.L. had also been shot four times in her shoulder and twice in her arm, but it was the gunshot wounds to the head that caused both women's deaths.

**1. Evidence is collected from the crime scene.**

{¶ 17} The area was canvassed for evidence. A woman's purse (determined to be N.C.'s) was found in the alley, lying on its side, its contents spilled on the ground. It appeared that someone had rummaged through it. There was a bag lying near the purse with faux gold jewelry in it, including rings. There was a ring on the ground near N.C.'s left arm and one ring in the blood that had run from her body. Her hand showed signs of possible injury.

{¶ 18} The passenger door of the vehicle was ajar and the back window was opened slightly. There were bullet defects in the driver's door. There was what appeared to be brain matter on the inside of the driver's door and an apparent injury to L.L.'s arm. When L.L.'s body was removed from the vehicle, a shell casing fell from her person. Another shell casing was found under her body. Three shell casings were found on the ground on the passenger side of the car, two shell casings were found in the front passenger seat, and two shell casings were found in the rear passenger side of the vehicle.

7.

A projectile (i.e., a bullet) was found in the street. It appeared to detectives that the shots were fired from inside the vehicle.

{¶ 19} The vehicle was processed further at the tow lot. There was a gap between the interior panel of the driver's side door and the door itself. Detective Javier Ramirez pulled on it and a bullet fell out the bottom of the door. Two additional casings were discovered at the tow lot.

{¶ 20} The area around the crime scene was canvassed for witnesses and surveillance cameras. Friends, family, and curious neighbors had gathered at the scene. Detective Danielle Mooney spoke with some of the victims' friends and family. Between the information provided by friends and family, an interview that she eventually conducted of Gilmer, and footage from surveillance cameras, she pieced together the events leading up to and immediately following the victims' deaths.

### 2. L.L. and N.C. were with Gilmer hours before they were killed.

{¶ 21} T.W. was a childhood friend of L.L. and N.C. In the late hours of November 6, 2021, into the early morning hours of November 7, 2021, T.W. encountered the two women at Wolf Pack Motorcycle Club on Cherry Street. L.L. introduced T.W. to her friend, Juvie—eventually determined to be Gilmer. T.W. had never met him before, but she knew his sisters and they had other acquaintances in common. T.W. talked with Gilmer and he told her that he was from the 700 block of Vance and he was out celebrating his brother's birthday.

8.

{¶ 22} L.L. asked Gilmer to go outside with her. At first, he ignored L.L. and said "fuck her, I'm mad at her." T.W. persuaded him to go outside with L.L. When they came back inside, L.L. appeared to be looking for something. She was moving things around. T.W. left the Wolf Pack before L.L. and hugged her on her way out.

{¶ 23} When she got home, T.W. saw someone on Facebook recording the scene at Vance and indicating that someone had been shot. T.W. went to bed. When she woke up, she saw messages on Facebook that said "RIP" L.L. and N.C. She went to Vance Street and told officers that Gilmer had been with L.L. and N.C. at the Wolf Pack.

{¶ 24} Based on conversations with friends and family, Detective Mooney learned that Gilmer and L.L. had a romantic relationship. From the information she had been given, she believed that Gilmer was the last person to see L.L. and N.C. alive. She also became aware that there was a warrant for Gilmer's arrest in connection with the June 28, 2021 shooting.

### 3. Gilmer is taken into custody.

{¶ 25} On November 8, 2021, at 1:16 a.m., Gilmer was a passenger in a vehicle that was involved in an automobile accident. His friend, L.T., was driving a car that was sideswiped on the expressway. Upon encountering Gilmer at the accident scene, responding officers placed him in custody.

{¶ 26} Detective Mooney interviewed L.T. L.T. told her that Gilmer (who people called Juv or Juvie) had been one of her closest friends. His younger brother died in March of 2021 in a four-wheeler crash, and there was a memorial for him in the 700

9.

block of Vance between Ewing and Elizabeth Streets.  Gilmer always wore a ring containing his brother's ashes.  He spent a lot of time at his brother's memorial.  Gilmer grew up on Vance; it was not the site of his brother's crash.

{¶ 27} On November 7, 2021, after getting off work at 6:30 a.m., going to the store, and preparing a meal, L.T. sat down to eat.  She scrolled through Facebook and saw that there was something happening on Vance.  She knew that people, including Gilmer, had been at the memorial on Vance that night for Gilmer's brother's birthday.  She became worried and tried calling her sister and niece to find out what was going on.  When they didn't answer the phone, she called Gilmer.  He answered the phone, but said that he did not know what was going on.  Some time before 8:56 a.m., they spoke again.  He asked her to pick him up at his brother's memorial.

{¶ 28} L.T. got to the memorial between 8:56 and 9:00 a.m.  She knew what time it was because she kept looking at her phone.  She called Gilmer to come out, but he didn't answer the phone.  After several minutes, Gilmer came out of 750 Vance (which was the home of a close friend of Gilmer's mother).  He was wearing blue jeans and a green Carhartt and appeared normal.

{¶ 29} There was still a lot of activity and police presence on Vance.  L.T. again asked Gilmer what was going on.  Gilmer said he didn't know, and he did not appear to be interested.  L.T. attempted to take Gilmer to his sister's house on Orchard, but she didn't answer.  They stopped for gas, then she drove him to his niece's house on Bancroft.  While he was in her car, Gilmer's mother called him and asked what had

10.

happened on Vance.  Gilmer responded that he didn't know and he did not have anything to do with it.

{¶ 30} After she dropped Gilmer off on Bancroft, L.T. went home.  She finished eating and went to sleep.  Around 3:45 p.m., she went to Bancroft again because there was supposed to be a candlelight vigil and balloon release for Gilmer's brother.  She went to the vigil for a little while.  There were a lot of people there, but she did not see Gilmer.  After the vigil, L.T. went to a bowling alley, then to a bar called Zinger's.  She saw Gilmer at Zinger's.  While there, someone asked Gilmer what had happened on Vance and whether he had anything to do with it.  He said no.

{¶ 31} Gilmer asked L.T. for a ride to his sister's house.  On their way, she was involved in an accident.  Police responded and in doing so, took Gilmer into custody.  Detective Mooney interviewed him.

{¶ 32} Gilmer provided his phone number to Detective Mooney and confirmed that he had his phone with him the previous night and morning.  Gilmer reluctantly admitted that he knew L.L., but denied that he knew N.C.  He said that he spent the early part of November 6, 2021, with L.L. and her family and children.  They took L.L.'s 12-year-old child to her grandmother's house on Buckingham, then L.L. dropped Gilmer off at his sister's house and they parted ways.  Gilmer claimed that he spent the evening with his friend to celebrate his friend's birthday and the birthday of Gilmer's deceased brother.  He said they went to Encore until it closed, went "shopping" for an after-hours club, then

11.

ended up at Wolf Pack. He maintained that he had been dropped off there and unexpectedly ran into L.L. and N.C.

{¶ 33} Gilmer admitted that he left Wolf Pack with L.L. and N.C. He said that they took him to his sister's house on Orchard. He sat in the back seat and the women sat in the front seats. The women talked to each other, while Gilmer looked down at his phone at a picture of his deceased brother and spoke to the picture as though he was talking to his brother. He told his brother that he was sorry he lost his ring and that he hoped he could find it. He said that he told L.L. and N.C. that he knew they probably did not have anything to do with the lost ring and that he wasn't mad at them—he was mad at himself for misplacing it.

{¶ 34} Gilmer said that the women dropped him off at 833 Orchard. He stayed on the porch and never went in. Instead he called L.T. to pick him up and left about half an hour later.

{¶ 35} Gilmer told Detective Mooney that his sister found his ring on the sink at her home on Orchard. She returned it to him the same day the victims were murdered.

### 4. Security footage and cell site activity are examined.

{¶ 36} Detective Mooney eventually obtained security footage from Wolf Pack and from a surveillance camera mounted at a carryout located at the corner of Broadway and Orchard, three houses down from Gilmer's sister's house. The video from Wolf Pack showed that Gilmer went to Wolf Pack with L.L. and N.C.—he did not accidentally run into them. He was wearing a black hooded sweatshirt. An hour and 44 minutes into

the video, L.L. came out of the bar using the flashlight app on her phone and appeared to be searching the ground, grass, and sidewalk. N.C. came out behind her and appeared to be looking, but not as diligently. About 23 minutes later, L.L. came out again with her phone flashlight, again appearing to be searching for something on the ground. Four minutes after that, L.L.'s vehicle pulled out of the parking lot and turned southbound on Cherry Street. It was 6:11 a.m. The Wolf Pack is three miles from Vance Street.

{¶ 37} The video from the carryout provided a direct view of cars coming and going down Orchard. Detective Mooney reviewed four hours of video, for the period of 6:00 a.m. to 10:00 a.m. At no point did she observe L.L.'s vehicle.

{¶ 38} A cell site analysis was conducted for Gilmer's telephone. FBI Special Agent Jacob Kunkle performed the initial analysis. Stated simply, between 6:45 a.m. and 6:59 a.m., Gilmer's phone communicated with cell towers (i.e., pinged) consistent with him being within range at 750 and 848 Vance. When Gilmer called L.T. later that morning to pick him up, his phone still pinged consistent with being on Vance. Gilmer's phone did not ping consistent with him being on Orchard.

{¶ 39} Special Agent Kunkle also performed a cell site analysis of L.T.'s phone. From 8:45 to 8:50 a.m., her phone pinged consistent with moving toward Vance. It did not ping consistent with picking up Gilmer on Orchard.

{¶ 40} Toledo Police Detective Jeffrey Sharp expanded the analysis to begin at 6:00 a.m. At 6:14 a.m., Gilmer's phone pinged northwest of 848 Vance and remained consistent with that location. It did not ping consistent with him being on Orchard.

13.

### 5. Evidence is tested and a connection between the incidents is discovered.

{¶ 41} BCI tested certain evidence collected from the crime scene against known DNA samples from Gilmer and the victims. The zipper and the pulls of the purse were tested. There were two major DNA contributors—N.C. and an unknown individual who was not L.L. or Gilmer. Additional DNA taken from those items was of an insufficient quantity or quality for analysis. A pack of cigarettes found in the back seat of the vehicle was tested. Male DNA found on the cigarette pack was consistent with Gilmer's DNA, but the profile was such that it was not expected to occur more frequently than one in 1,445 male individuals in the United States. The rear door handle was tested, but the DNA taken from the handle was of an insufficient quantity or quality for analysis. Two rings were tested. N.C.'s DNA was identified on both rings. There was male DNA on one of the rings, but it was of an insufficient quantity or quality for analysis.

{¶ 42} Casings and projectiles recovered from both crime scenes were analyzed by the Toledo Police Forensic Laboratory. David Cogan, the laboratory administrator, determined that all the casings collected from the June 28, 2021 shooting, and all the casings and projectiles collected from the scene of the November 7, 2021 murders, were fired from the same gun. A gun was recovered from nearby Swan Creek on November 10, 2021, but it was determined that the casings and projectiles were not fired from that gun. The murder weapon has not been found.

## D. The Verdict

{¶ 43} In Lucas County case No. CR0202102065, the jury found Gilmer guilty of all counts and the accompanying firearms specifications. The court determined that Count 3 was an allied offense of Counts 1 and 2 and merged those counts for purposes of sentencing. It imposed an indefinite term of a minimum of eight years to a maximum of 12 years in prison on Count 1; an indefinite term of a minimum of eight years to a maximum of 12 years in prison on Count 2; and 36 months in prison on Count 4. It ordered that those sentences be served consecutively to each other and consecutively to the sentences in CR0202201132. The court imposed a mandatory and consecutive term of three years in prison on the firearms specifications in both Counts 1 and 2, but determined that those specifications merged with each other.

{¶ 44} In Lucas County case No. CR0202201132, the jury found Gilmer guilty of all counts and all accompanying firearms specifications. The court determined that Counts 3, 4, 5, 6 and 7 are allied offenses of similar import of Counts 1 and 2 and merged those counts for purposes of sentencing. The state elected that Gilmer be sentenced on Counts 1 and 2. The court imposed a term of life in prison without parole on both counts. It ordered that Gilmer serve those sentences consecutively to each other and consecutively to the sentences imposed in CR0202102065. The court imposed a mandatory and consecutive term of three years in prison on the firearms specifications on both Counts 1 and 2, but determined that those specifications merged with each other.

15.

**{¶ 45}** The court found Gilmer to be a repeat violent offender under R.C. 2929.149.  It imposed a mandatory 10-year sentence for that specification.

**{¶ 46}** Although not addressed at the sentencing hearing, the trial court in its December 1, 2022 judgment entries in both cases found that Gilmer has, or reasonably may be expected to have, the means to pay all or part of the applicable costs of supervision, confinement, prosecution, and appointed counsel and ordered Gilmer to pay these costs.

**{¶ 47}** Gilmer appealed.  He assigns the following errors for our review:

> I.  The trial court abused its discretion by denying Appellant's motion to sever indictments, pursuant to Crim.R. 14.

> II.  The trial court abused its discretion by denying Appellant's motion for acquittal pursuant to Crim.R. 29, because the convictions herein were not supported by sufficient evidence to submit to the jury.

> III.  All of Appellant's convictions were not supported by the manifest weight of the evidence.

> IV.  The trial court abused its discretion by failing to merge all appropriate sentences on the basis of allied offenses of similar import.

> V.  The trial court abused its use of consecutive sentences by imposing time additional to two consecutive sentences without the possibility of parole which is disproportionate to the harm caused in this matter.

VI. The trial court abused its discretion when it ordered Appellant to pay the costs of prosecution, supervision, confinement, and appointed counsel without testimony about appellant's ability to pay, or his employment history during the trial or at sentencing.

VII. Cumulative error deprived Appellant of a fair trial.

## II. Law and Analysis

{¶ 48} In his first assignment of error, Gilmer argues that the trial court erred when it denied his motion to sever the indictments for purposes of trial. In his second assignment of error, he argues that the trial court erred when it denied his motion for acquittal. In his third assignment of error he argues that his convictions are against the manifest weight of the evidence. In his fourth assignment of error, he argues that certain counts were allied offenses that should have merged for purposes of sentencing. In his fifth assignment of error, he argues that the trial court erred in imposing consecutive sentences. In his sixth assignment of error, he argues that the trial court erred in imposing certain costs. And in his seventh assignment of error, he argues that cumulative error deprived him of a fair trial.

{¶ 49} We address each of Gilmer's assignments of error in turn.

### A. Motion to Sever

{¶ 50} In his first assignment of error, Gilmer argues that the trial court abused its discretion when it denied his motion to sever the indictments. He argues that he was substantially prejudiced by the joinder of the cases because (1) there was no evidence

17.

introduced that the same gun was used in both instances "beyond a reasonable doubt"; (2) the state failed to file a notice of intent to introduce other-acts evidence under Evid.R. 404(B); and (3) joinder of the two cases buttressed the state's identification of Gilmer as the perpetrator of the November 2021 murders.

{¶ 51} The state responds that Gilmer cannot prevail on his claim of prejudice because (1) his motion to sever lacked analysis and citation to authority, was not renewed at the outset of the trial, and was not renewed after the close of evidence; (2) the "other-acts evidence" here would have otherwise been admissible if the cases had been tried separately; and (3) the evidence supporting the two crimes was simple and direct.

{¶ 52} In *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 61-63, the Ohio Supreme Court recognized that joining multiple offenses in a single trial is favored because it conserves resources and minimizes the possibility of incongruous results in successive trials before different juries. Nevertheless, Crim.R. 14 permits a defendant to request severance on the basis that he or she will be prejudiced by the joinder. The defendant bears the burden of providing the trial court with sufficient information to allow it to weigh the considerations favoring joinder against the defendant's right to a fair trial. "Even then, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could have introduced evidence of the joined offenses as 'other acts' under Evid.R. 404(B); or (2) the 'evidence of each crime joined at trial is simple and direct.'" *Id.* at ¶ 62, quoting *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

18.

{¶ 53} Generally, we review a trial court's decision denying a Crim.R. 14 motion for an abuse of discretion. On appeal, the defendant must "affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." *Id.* at ¶ 63, citing *State v. Schaim,* 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992).

{¶ 54} A pretrial motion to sever must be renewed at the close of the state's case or at the close of all of the evidence so that the trial court can conduct a Crim.R. 14 analysis in light of all the evidence presented. *State v. Andrews*, 6th Dist. Ottawa No. OT-22-056, 2023-Ohio-4237, ¶ 41. "Failure to renew the motion forfeits all but plain error on appeal." *State v. Marshall*, 6th Dist. Lucas No. L-22-1207, 2023-Ohio-3542, ¶ 41, *appeal not allowed,* 172 Ohio St.3d 1466, 2024-Ohio-163. Plain error is error that affects substantial rights. Crim.R. 52(B). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.,* citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "Reversal is warranted only if the outcome of the trial clearly would have been different absent the error." *Id.,* citing *Long* at paragraph two of the syllabus.

19.

**{¶ 55}** Here, Gilmer's motion was insufficient to allow the court to weigh the considerations favoring joinder against Gilmer's right to a fair trial. The motion provided no explanation, analysis, or authority for his assertion that he would be "severely prejudiced" by the joinder and would receive "an unfair trial." His motion was properly denied on this basis alone. Moreover, Gilmer did not renew his motion to sever at the close of the state's evidence, or at the close of all evidence, so he has forfeited all but plain error.

**{¶ 56}** Even assuming that Gilmer had filed a properly-supported motion and renewed his motion as required, we find that the state has overcome Gilmer's claim of prejudice by establishing both that it could have introduced evidence of the joined offenses as "other acts" under Evid.R. 404(B), *and* that the evidence of each crime joined at trial was simple and direct.

**1. Other acts evidence would have been admissible under Evid.R. 404(B).**

**{¶ 57}** To determine whether evidence of other acts is admissible, the first step is determining whether the evidence is relevant in two respects: (1) to the particular purpose for which it is offered—i.e., a non-character-based purpose, as allowed by Evid.R. 404(B)—and (2) to an issue that is actually in dispute—i.e., an issue that is material to the case, as required by Evid.R. 401. *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 37-38, citing *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 26-27; *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. If the evidence passes the relevancy test, the final step to

20.

determining its admissibility is considering, under Evid.R. 403(A), whether the value of the evidence "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *Smith* at ¶ 38, citing *Hartman* at ¶ 29; *Williams* at ¶ 20.

{¶ 58} Under Evid.R. 404(B)(2), other-acts evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Gilmer acknowledges that identification of the perpetrator of the murders was at issue here, but he either misunderstands or misstates the manner in which the state sought to use other acts evidence to prove identity.

{¶ 59} Gilmer highlights factual differences between the June and November 2021 incidents (e.g., the first involved "shooting towards an occupied vehicle" while the second involved shooting "from inside the car;" in the first incident "no one was injured" while the second incident involved "the apparent execution of two people;" the first incident occurred over "a dispute over the driver's dog" while there was "no evidence presented of any altercation" in the second incident; the first incident occurred in the "middle of the day" while the second incident occurred at "7am") and maintains that the other-acts evidence did not establish a "behavioral footprint" from which it could be concluded that the same person committed both crimes. He either ignores or fails to recognize that the state sought to prove the identity of the unknown perpetrator by showing that the victims were killed with the *same firearm* that the known perpetrator

21.

used to shoot at K.B.'s vehicle—not by establishing a behavioral footprint to connect the crimes.

{¶ 60} To that end, Gilmer also misrepresents the record. He incorrectly states that "[t]he only evidence 'connecting' the firearm in the second incident to the first was Det. Cogan's testimony that the firearms used in the two incidents were the same caliber." In fact, Cogan testified unambiguously that the cartridges and bullets retrieved from both crime scenes were all fired from the same weapon.

{¶ 61} In *State v. Williams,* 73 Ohio St.3d 153, 158, 652 N.E.2d 721 (1995), appellant was convicted of the aggravated murder and aggravated robbery of one victim and the felonious assault and aggravated robbery of a second victim, two separate incidents. The state presented ballistic evidence that tended to show that the casings recovered from the two crime scenes had been loaded in, chambered in, and extracted from, the same firearm. On appeal, appellant argued that he was unfairly prejudiced by the trial court's failure to sever the charges. The Ohio Supreme Court explained that the state may counter a claim of prejudicial joinder by showing that it could have introduced evidence of one offense in the trial of the other as other-acts evidence under Evid.R. 404(B). It recognized that "[e]vidence tending to show that the same gun was used in both crimes is pertinent to the issue of identity," and concluded that the trial court did not err in denying appellant's motion to sever. *See also State v. Dunn*, 5th Dist. Stark No. 2008-CA-00137, 2009-Ohio-1688, ¶ 100 (joinder proper where same firearms were used in drive-by shooting and in victim's murder, thus evidence of other shootings would have

22.

been admissible to prove appellant's identity as perpetrator of murder); *State v. Martin,* 151 Ohio App.3d 605, 2003-Ohio-735, 784 N.E.2d 1237, ¶ 44 (3d Dist.) (joinder proper where there was evidence that the same weapon was used in December 26, 2000 aggravated menacing incident and May 9, 2001 aggravated murder).

{¶ 62} Here, K.B. identified Gilmer as the shooter in the June 2021 incident. The casings found at the scene of that incident were found to have been fired from the same firearm as the casings and bullets recovered from the November 2021 crime scene. The evidence from the first incident was offered for the purpose of proving Gilmer's identity as the shooter in the second incident, and its probative value was not outweighed by the danger of unfair prejudice. The evidence, therefore, would have been properly admitted under Evid.R. 404(B)(2) if the cases had been tried separately.

### 2. Evidence of each crime was simple and direct.

{¶ 63} In addition to showing that joinder was not prejudicial because "other acts" could have been introduced in the trial of the other, the state may also counter the claim of prejudice by showing that evidence of each of the crimes joined at trial is simple and direct. *State v. Franklin*, 62 Ohio St.3d 118, 123, 580 N.E.2d 1 (1991). "Evidence is 'simple and direct' if the jury is capable of readily separating the proof required for each offense, if the evidence is unlikely to confuse jurors, if the evidence is straightforward, and if there is little danger that the jury would 'improperly consider testimony on one offense as corroborative of the other.'" *State v. Wilson*, 2017-Ohio-5724, 93 N.E.3d 1282, ¶ 51 (5th Dist.), quoting *State v. Freeland*, 4th Dist. Ross No. 12CA3352, 2015-

23.

Ohio-3410, ¶ 14, citing *State v. Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 34. "If the state can meet the joinder test, it need not meet the stricter 'other acts' test." *Franklin* at 123.

{¶ 64} Here, the state maintains that evidence of each crime here was simple and direct because the incidents were presented chronologically, there was little crossover between witnesses to the June 2021 shooting and the November 2021 murders, and the jury could easily separate out the proof required for each offense. We agree. The evidence was presented in an organized, straightforward manner that was unlikely to confuse jurors. The evidence could be readily separated as to the proof required for each offense and there was little danger that the jury would improperly consider the testimony pertinent to one offense as corroborative of the other.

{¶ 65} We find no error, let alone plain error, in the trial court's denial of Gilmer's motion to sever. We find Gilmer's first assignment of error not well-taken.

## B. Crim.R. 29(A) Motion for Acquittal

{¶ 66} In his second assignment of error, Gilmer argues that the trial court erred when it denied his Crim.R. 29(A) motion for acquittal. A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

24.

{¶ 67} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 68} Gilmer argues that there was insufficient evidence of (1) his identity as the shooter; (2) the commission of an aggravated robbery; and consequently, (3) the commission of aggravated murder. His argument with respect to his identity is largely based on his first assignment of error. He claims that absent the improper evidence of the June 28, 2021 incident, the evidence was insufficient to prove his identity as the shooter in the November 7, 2021 murders.

{¶ 69} We have already concluded that the two cases were properly tried together. K.B. positively identified Gilmer as the shooter in the June 28, 2021 incident. As to the November 7, 2021 murders, Gilmer admitted that he left Wolf Pack with the victims at

25.

6:11 a.m. Although he claimed that they took him to Orchard Street, surveillance cameras demonstrated that L.L.'s vehicle did not travel toward Orchard. Moreover, cell site analysis showed that Gilmer was on Vance at 6:14 a.m. and stayed on Vance until L.T. picked him up around 9:00 a.m. The 9-1-1 caller saw the shooter and described that he was wearing a black hooded sweatshirt. Gilmer was seen on the Wolf Pack cameras wearing a black hooded sweatshirt. And the forensic laboratory determined that the bullets and casings found at the scene of the November 7, 2021 murders were fired from the same gun as the casings recovered after the June 28, 2021 shooting. All this evidence was sufficient to prove Gilmer's identity as the perpetrator of the murders.

{¶ 70} Gilmer claims that, "the state admitted they did not produce evidence of Appellant's whereabouts between approximately 6:11 am and 6:45 am, and that they did not produce a report showing where the victims were during the same time period[.]" In fact, Detective Sharp testified that he did a cell phone site analysis for the period of 6:00 a.m. to 9:00 a.m. At 6:14 a.m., Gilmer's phone pinged northwest of 848 Vance and remained consistent with that location. It did not ping consistent with him being on Orchard.

{¶ 71} As to Gilmer's claims that sufficient evidence of aggravated robbery was not presented, Gilmer was convicted under R.C. 2911.01(A)(3). Under this statute, "[n]o person, in attempting or committing a theft offense, as defined in [R.C.] 2913.01 * * *, or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, or attempt to inflict, serious physical harm on another." A "theft offense" is defined to include

26.

knowingly obtaining or exerting control over property without the consent of its owner with the purpose to deprive the owner of the property. R.C. 2913.02(A)(1).

{¶ 72} The state's theory of the case was that Gilmer lost his ring with his brother's ashes; the victims helped search for the ring but could not find it; Gilmer suspected that one of them had it, so he killed them, pulled rings off N.C.'s fingers as she lay dead in the street thinking he would find the ring on her finger, and fled with her purse, which he discarded after rummaging through it and determining that the ring wasn't there either. Ultimately, the ring had been at his sister's house the whole time and was returned to him after the murders.

{¶ 73} Gilmer maintains that "there was no evidence that the ring was stolen." "In fact," he argues, "the evidence indicated that appellant had simply misplaced it." But it was never the state's position that Gilmer's ring had been stolen—it was the state's position that Gilmer mistakenly *believed* that his ring had been stolen. This mistaken belief was why, it claimed, Gilmer killed the victims. The aggravated robbery underlying the aggravated murder was Gilmer's theft of N.C.'s rings and purse, which he forcibly took, but then rejected after determining that his ring was not there. Notably, a person need not permanently withhold or retain property or remove it from the owner's premises in order for it to constitute a theft offense. *State v. Nibert*, 4th Dist. Meigs No. 96 CA 31, 1997 WL 600405, * 2 (Sept. 26, 1997) (disagreeing with appellant that act of discarding wallet and credit cards he took from woman's purse constituted an attempted theft of the credit cards and not a completed theft).

27.

**{¶ 74}** Gilmer emphasizes that there was no evidence that his DNA was on N.C.'s rings—there was only indeterminate evidence of male DNA on one of them. But DNA is not required to sustain a conviction. The absence of DNA was a matter for the jury to weigh. It did not render the state's evidence insufficient. *See State v. English*, 1st Dist. Hamilton No. C-180697, 2020-Ohio-4682, ¶ 29 (explaining that state is not required to present DNA evidence connecting defendant to crime).

**{¶ 75}** Finally, Gilmer insists that there was no evidence of any other theft of property from the crime scene. But as we have explained, the state, in fact, offered evidence that N.C.'s purse had been taken, ransacked, and left in the alley where D.T. saw the shooter run. It also offered evidence that N.C.'s rings were forcibly removed from her fingers but rejected when Gilmer determined that she did not have the ring he was looking for.

**{¶ 76}** In sum, the state presented sufficient evidence identifying Gilmer as the shooter, and it presented sufficient evidence that an aggravated robbery occurred. Accordingly, we find Gilmer's second assignment of error not well-taken.

### C. Manifest Weight of the Evidence

**{¶ 77}** In his third assignment of error, Gilmer argues that his convictions were against the manifest weight of the evidence. When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such

28.

a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 78} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 79} In particular, as to his convictions of aggravated murder, Gilmer claims that without the other-acts evidence, Gilmer's identity as the perpetrator was not proven beyond a reasonable doubt. He also argues that the eyewitness described that the November 2021 shooter was much shorter than Gilmer and was seen shooting as he ran backwards away from the scene—not standing over N.C. or shooting from inside the car. As to his aggravated-robbery convictions, Gilmer argues that there was no evidence that

29.

N.C.'s rings were stolen, that his ring was stolen, or that he touched N.C.'s rings during the November 2021 incident.

{¶ 80} The state responds that an inconsistency in evidence does not entitle a defendant to reversal on manifest-weight grounds. It also points out that the witness's description of Gilmer's clothing matched his attire on the surveillance video, and the witness herself acknowledged during her call that she had difficulty estimating his height due to the distance. The state emphasizes that the same firearm was used to commit both the shootings in June and November, DNA consistent with Gilmer's was found on the cigarette pack in the back seat of the vehicle, Gilmer admitted to being in the car, and his denial of being on Vance during the relevant time periods was contradicted by the cell site location data. As to the aggravated robbery charge, the state argues that N.C.'s rings were removed from her body and the ransacked purse was taken, both of which satisfied the element of the exertion of control over the property of another. It maintains that the evidence supported its theory of the case, which was that Gilmer lost his ring with his brother's ashes, the victims tried to help him find it, Gilmer believed that one of the victims had taken the ring, but after pulling N.C.'s rings off and looking through her purse, Gilmer did not find the ring. It had been at his sister's house all along.

{¶ 81} We agree with the state that Gilmer's aggravated murder convictions were not against the manifest weight of the evidence. K.B. positively identified Gilmer as the person who shot at her and her daughter in June of 2021. The same weapon was used to kill L.L. and N.C. Video surveillance showed that Gilmer left the Wolf Pack with L.L.

30.

and N.C. Gilmer admitted that he left with the women and a pack of cigarettes found in the back seat bore DNA consistent with Gilmer's. And despite claims that he was dropped off on Orchard Street, cell phone location data showed that Gilmer was on Vance Street from 6:14 a.m. till 9:00 a.m., when his friend picked him up on Vance.

{¶ 82} We also agree with the state that Gilmer's aggravated robbery convictions were not against the manifest weight of the evidence. N.C.'s rings had been forcibly removed from her fingers. Her purse was taken, ransacked, and left in the alley because it did not contain the item Gilmer was looking for.

{¶ 83} The jury did not clearly lose its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. This is not the exceptional case in which the evidence weighs heavily against the conviction. Accordingly, we find Gilmer's third assignment of error not well-taken.

### D. Merger

{¶ 84} In his fourth assignment of error, Gilmer argues that the trial court failed to merge all appropriate sentences as allied offenses of similar import. He acknowledges that in Lucas County case No. CR0202102065, the trial court determined that Count 3 (discharge of a firearm at or near a prohibited premises) was an allied offense of Counts 1 and 2 (two counts of felonious assault) and merged those counts for purposes of sentencing. It then sentenced him on Counts 1, 2, and 4 (having weapons while under disability). But Gilmer argues that Count 4 should also have merged with Counts 1 and 2

31.

because "it was simply a result of a prior conviction," it "did not require any action by [Gilmer], other than his obtaining possession of a firearm," and it "did not cause separate or identifiable harm, was not committed separately from the shooting, and was not committed with a separate animus or motivation."

{¶ 85} The state responds that Gilmer acquiesced to the trial court's determinations of which counts would merge as allied offenses. It also emphasizes that Ohio courts have rejected the notion that a conviction of having a weapon under disability must merge with felonious assault.

{¶ 86} The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution, applicable to the state through the Fourteenth Amendment, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10. The Double Jeopardy Clause protects against a number of abuses. *Id.* Pertinent to this case is the protection against multiple punishments for the same offense. *Id.* To that end, the General Assembly enacted R.C. 2941.25, which directs when multiple punishments may be imposed. *Id.* It prohibits multiple convictions for allied offenses of similar import arising out of the same conduct:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

32.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 87} In *Ruff*, the Ohio Supreme Court examined in detail the analysis that must be performed in determining whether offenses are allied offenses of similar import under R.C. 2941.25. It identified three questions that must be asked: "(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?" *Id.* at ¶ 31. If the answer to any of these questions is "yes," the defendant may be convicted and sentenced for multiple offenses. *Id.* at ¶ 25, 30. The court explained that offenses are of *dissimilar* import "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at ¶ 23. It emphasized that the analysis must focus on the defendant's conduct, rather than simply compare the elements of two offenses. *Id.* at ¶ 30.

{¶ 88} The defendant bears the burden of establishing that R.C. 2941.25 prohibits multiple punishments. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18, citing *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987). An appellate court reviews de novo whether offenses should be merged as allied offenses under R.C. 2941.25. *State v. Bailey,* 171 Ohio St.3d 486, 2022-Ohio-4407, 218

33.

N.E.3d 858, ¶ 5, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 1. "Although determining whether R.C. 2941.25 has been properly applied is a legal question, it necessarily turns on an analysis of the facts * * *." *Id.* at ¶ 11.

{¶ 89} Here, we agree with the state that having a weapon while under disability is not an allied offense of felonious assault. As explained by numerous other districts, "the animus of having weapons under disability is making a conscious choice to possess a weapon. Felonious assault requires a conscious choice to attack someone using a weapon." *State v. Frazier*, 2d Dist. Clark No. 2021-CA-46, 2021-Ohio-4155, ¶ 22, citing *State v. Elder*, 5th Dist. Richland No. 2011-CA-0058, 2011-Ohio-4438, ¶ 7. *See also State v. Scott,* 3d Dist. Allen No. 1-21-51, 2022-Ohio-2820, ¶ 22; *State v. Rhodes*, 7th Dist. Mahoning No. 20 MA 0099, 2022-Ohio-2337, ¶ 57 (explaining that having weapons under disability occurs when the offender makes the choice to first possess the weapon; "[t]he fact that [the defendant] then used the weapons to commit the other crimes does not absolve [the defendant] of the criminal liability that arises solely from his decision to illegally possess the weapons." (Internal quotations and citations omitted.)).

{¶ 90} Accordingly, we find Gilmer's fourth assignment of error not well-taken.

### E.  Consecutive Sentences

{¶ 91} In his fifth assignment of error, Gilmer argues that the trial court erred by imposing prison sentences in Lucas County case No. CR0202102065 that would run consecutively to the two life terms imposed in Lucas County case No. CR0202101132.

34.

Gilmer argues that consecutive sentences are not necessary to protect the public and are not proportionate to his conduct.

{¶ 92} Under R.C. 2929.14(C)(4), where a trial court imposes multiple prison terms for convictions of multiple offenses, it may require the offender to serve the prison terms consecutively if it finds that "consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and if it also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

35.

{¶ 93} This statute requires the trial court to make three statutory findings before imposing consecutive sentences. *State v. Beasley*, 158 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 252; *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 26. It must find that (1) consecutive sentences are necessary to protect the public or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger that the offender poses to the public; and (3) R.C. 2929.14(C)(4)(a), (b), or (c) is applicable. *Beasley* at ¶ 252. "[T]he trial court must make the requisite findings *both* at the sentencing hearing and in the sentencing entry." (Emphasis in original.) *Id.* at ¶ 253, citing *Bonnell* at ¶ 37. While "a word-for-word recitation of the language of the statute is not required," a reviewing court must be able to discern that the trial court engaged in the correct analysis and the record must contain evidence to support the trial court's findings. *Bonnell* at ¶ 29.

{¶ 94} Gilmer argues that consecutive sentences are not necessary to protect the public and are not proportionate to his conduct. He maintains that "the imposition of two life sentences without parole is duplicative, and disproportionate to the harm here." And he claims that the aggregate total sentence here is disproportionate to the harm caused.

{¶ 95} The state responds that Gilmer murdered two people, one of whom he was romantically involved with. Both victims were shot twice in the head, and one victim was shot eight times and at least once at close range. It emphasizes that the murders were committed within months of his shooting at a vehicle occupied by the mother of his unborn child and her five-year-old daughter. And it observes that Gilmer has committed

36.

previous offenses of violence. Under these circumstances, it claims, the imposition of consecutive terms was not disproportionate.

{¶ 96} In its most recent iteration of *State v. Gwynne*, Slip Opinion No. 2023-Ohio-3851, ¶ 5 ("*Gwynne V*"), the Ohio Supreme Court explained that "[t]he plain language of R.C. 2953.08(G)(2) requires an appellate court to defer to a trial court's consecutive-sentence findings, and the trial court's findings must be upheld unless those findings are clearly and convincingly not supported by the record." The trial court found as follows:

> The court finds that a consecutive sentence is necessary to protect the public from future crime or to punish the defendant and not disproportionate to the seriousness of the defendant's conduct or the danger the defendant poses. The court further finds that the harm caused was so great or unusual that no single prison term for any of the offenses committed as any of the courses of conduct adequately reflects the seriousness of the offender's conduct and defendant's criminal history requires consecutive sentences.

{¶ 97} The trial court made all the requisite findings before imposing consecutive sentences here. Having reviewed the transcript in its entirety, we cannot conclude that the trial court's findings are clearly and convincingly not supported by the record. Gilmer was convicted of murdering his girlfriend and her friend just six months after shooting at a vehicle occupied by his pregnant ex-girlfriend and her daughter. Moreover,

37.

this was not the first time that Gilmer had been convicted of an offense of violence. We find Gilmer's fifth assignment of error not well-taken.

## F. Costs

{¶ 98} In his sixth assignment of error, Gilmer argues that the trial court erred when it ordered him to pay the costs of prosecution, supervision, confinement, and appointed counsel. The state concedes that the costs of confinement and appointed counsel were not properly imposed, but maintains that the imposition of the costs of prosecution was at most harmless error. We review a challenge to the imposition of costs under R.C. 2953.08(A)(4) and (G)(2)(b) to determine whether it was contrary to law to impose such costs. *State v. Velesquez,* 6th Dist. Lucas No. L-22-1167, 2023-Ohio-1100, ¶ 12, quoting *State v. Ivey*, 6th Dist. No. L-19-1243, 2021-Ohio-2138, ¶ 7, citing R.C. 2953.08(A)(4) and (G)(2)(b).

{¶ 99} The court made no mention of costs at the sentencing hearing; however, in its December 1, 2022 judgment entries, it ordered Gilmer to pay the costs of prosecution, supervision, confinement, and appointed counsel.

{¶ 100} First, as to costs of supervision, under 2951.021(A)(1), a trial court may impose costs of supervision on a felony offender sentenced to a *community control* sanction. Gilmer was sentenced to a term of prison and not community control, therefore, the costs of supervision are not applicable here. *State v. Eaton,* 6th Dist. Lucas No. L-18-1183, 2020-Ohio-3208, ¶ 33 ("The costs of supervision are not at issue in this case because a prison term was imposed."); *Velesquez* at ¶ 12.

38.

{¶ 101} Second, a trial court may order an offender to pay the costs of confinement and the costs of appointed counsel, but the imposition of these costs is discretionary and requires consideration of the offender's ability to pay. *See State v. Moore*, 6th Dist. Erie No. E-19-009, 2019-Ohio-4609, ¶ 13, citing R.C. 2941.51(D); *Velesquez* at ¶ 9, citing R.C. 2929.19(B)(5). "Where courts fail to address discretionary costs at the sentencing hearing, but include imposition of costs within the sentencing entry, we have consistently found the imposition of costs to be contrary to law, and vacated the portion of the judgment imposing discretionary costs." *State v. Henderson*, 6th Dist. Lucas No. L-23-1098, 2023-Ohio-4576, ¶ 16, citing *State v. Wymer,* 6th Dist. Lucas No. L-18-1108, 2019-Ohio-1563, ¶ 14; *State v. Hill,* 6th Dist. Lucas No. L-18-1160, 2020-Ohio-1237, ¶ 30; *State v. Temple*, 6th Dist. Lucas No. L-18-1070, 2019-Ohio-3503, ¶ 13; *Velesquez* at ¶ 12-13. *But see State v. Fisher,* 6th Dist. Lucas No. L-22-1150, 2023-Ohio-2088, ¶ 34 (affirming imposition of discretionary costs despite trial court's failure to address them at sentencing hearing because information in PSI supported a finding of offender's ability to pay). We, therefore, vacate the costs of confinement and appointed counsel.

{¶ 102} Finally, as to the costs of prosecution, R.C. 2947.23 requires the trial court to impose the costs of prosecution in all criminal cases against all convicted defendants regardless of their financial status, and no hearing is required before ordering the payment of those costs. *See State v. Nettles*, 6th Dist. Lucas No. L-17-1205, 2018-Ohio-4540, ¶ 31. Significantly, R.C. 2947.23(C) vests the trial court with continuing

39.

jurisdiction to waive, suspend, or modify the payment of the costs of prosecution, at the time of sentencing or at any time thereafter. Thus, Gilmer may apply to the trial court for waiver of these costs, but we find no error in the trial court's imposition of the costs of prosecution.

{¶ 103} Accordingly, we find Gilmer's sixth assignment of error well-taken, in part and not well-taken, in part. We vacate the December 1, 2022 judgments *only* with respect to the imposition of the costs of confinement and appointed counsel. We affirm the judgment in all other respects.

### G. Cumulative Error

{¶ 104} In his final assignment of error, Gilmer argues that the cumulative effect of the errors in this case deprived him of a fair trial. "Under the doctrine of cumulative error, a judgment may be reversed when the cumulative effect of errors deprives a defendant of his or her constitutional rights, even though such errors are not prejudicial singly. *State v. Williams*, 149 Ohio App.3d 434, 2002-Ohio-4831, 777 N.E.2d 892, ¶ 36 (6th Dist.), citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987). For the cumulative error doctrine to apply, there must first be a finding that multiple errors were committed at trial. *State v. Moore*, 6th Dist. Wood No. WD-18-030, 2019-Ohio-3705, ¶ 87, citing *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). Then, there must be a finding that there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately

40.

harmless errors. *Id.,* citing *State v. Moreland*, 50 Ohio St.3d 58, 69, 552 N.E.2d 894 (1990).

{¶ 105} There has been no showing that any trial errors were committed here, let alone multiple errors. Accordingly, we find Gilmer's seventh assignment of error not well-taken.

### III. Conclusion

{¶ 106} The trial court did not err in denying Gilmer's motion to sever. The evidence of each crime was simple and direct, and the state could have introduced evidence of the joined offenses as other acts under Evid.R. 404(B). We find his first assignment of error not well-taken. Gilmer's convictions were not against the sufficiency or weight of the evidence. We find his second and third assignment of errors not well-taken. Gilmer's conviction for having a weapon while under disability did not merge with his felonious assault convictions. We find his fourth assignment of error not well-taken. The trial court made all the requisite findings before imposing consecutive sentences here and we cannot conclude that those findings are clearly and convincingly not supported by the record. We find Gilmer's fifth assignment of error not well-taken. Gilmer has failed to identify cumulative error requiring reversal. We find his seventh assignment of error not well-taken.

{¶ 107} With respect to Gilmer's sixth assignment of error, the trial court erred when it imposed costs of confinement and appointed counsel because it failed to do so on the record at the sentencing hearing. It properly imposed the costs of prosecution.

41.

Gilmer's sixth assignment of error is, therefore, well-taken, in part, and not well-taken, in part. We reverse and vacate the December 1, 2022 judgments *only* with respect to the imposition of the costs of confinement and appointed counsel. We affirm the judgment in all other respects. Gilmer and the state are ordered to share in the costs of this appeal under App.R. 24.

Judgment affirmed, in part,<br>and reversed and vacated, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.                        _____
JUDGE

Myron C. Duhart, J.                       

_____
Charles E. Sulek, P.J.                       JUDGE
CONCUR.

_____<br>JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.